UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLEN HERRMANN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 07 C 6914 |
| v. ) | |
| ) | Magistrate Judge Cole |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Glen Herrmann, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Herrmann asks the court to reverse the Commissioner's decision and award benefits, or remand the decision for further proceedings. The Commissioner seeks an order affirming the decision.

### I.
### PROCEDURAL HISTORY

Mr. Herrmann applied for DIB and SSI on December 2, 2004, alleging that he had been disabled since April 30, 2002, due to long-term intermittent depression. (Administrative Record ("R.") 76-81, 99). His application was denied initially and upon reconsideration. (R. 30-38). Mr. Herrmann continued pursuit of his claim by filing a timely request for hearing on August 5, 2005. (R. 51).

An administrative law judge ("ALJ") convened a hearing on January 19, 2006, at which Mr. Herrmann, represented by counsel, appeared and testified. (R. 592-633). In addition, Dr. Joseph Cools testified as a medical expert, and James Radke testified as a vocational expert. (R. 629). On March 20, 2006, the ALJ issued a decision finding Mr. Herrmann not disabled. (R. 20-29). The ALJ determined that Mr. Herrmann could perform a limited range of light work, that was of a low to moderate stress level, as long as it was performed primarily alone, and involved no regular contact with the general public or supervisors. (R. 26). Accordingly, the ALJ found Mr. Herrmann not entitled to DIB or SSI. (R. 28-29). This became the final decision of the Commissioner when the Appeals Council denied Mr. Herrmann's request for review of the decision on October 5, 2007. (R. 7-9). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Herrmann has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Mr. Herrmann was born on May 26, 1953, making him fifty-two years old at the time of the ALJ's decision. (R. 76). He completed one year of college. (R. 106). He has a sporadic work history, holding eighteen different jobs from 1994 through 2003. (R. 100-101). The majority of these were seasonal, mostly working for brief periods in holiday photography. (R.100-101). He did spend three years as a front desk clerk at a hotel from 1989 to 1992, easily his longest tenure at any position . (R. 100-101). As for his seasonal work, he was repeatedly hired for every holiday season at the photography studio over a period of about four years. (R. 160-61, 187-88, 229). He last

2

worked as a pool liner installer. He quit that job because "the pay was poor, no taxes were taken out, it was hard labor and [he] felt too old to keep up. . . . [he] traveled 100 miles a day and . . . . was not paid for traveling." (R. 100).

## B.
## Medical Evidence

While the record includes evidence regarding Mr. Herrmann's coronary artery disease and insulin-dependent diabetes, Mr. Herrmann makes no mention of it, and finds no fault with the ALJ finding these impairments limited him to light work. It is, instead, Mr. Herrmann's depression that is the focus of his challenge to the ALJ's denial of his application for DIB and SSI; this is what he contends precludes him from working. Mr. Herrmann puts it this way:

> Mild chronic depression, over a prolonged period. Has caused me to avoid success in spite of my ability to perform my duties. I have not been able to maintain career opportunities or inter-personal relationships for any length of time throughout my life. My longest stay at a company was 5 years of seasonal employment (Easter, Christmas as manager of photo outlet. Attention deficit or getting bored with positions seems to have prevented me from finding consistent success and achievement. Decreased energy due to depression is something I have avoided until tasks have been completed. After my seasonal work was over, it took months to recover. That was after 80 hour weeks, with constant exposure to children. I often felt that others did not appreciate my efforts or worked against me, in my efforts, sometimes in anger and despair. I love to work and often put in more effort than I can sustain. Lack of challenging work and good pay has caused tremendous frustration in my daily life.

(R. 99).

Mr. Herrmann reports a suicide attempt that was a "cry for help" some twenty years ago. (R. 243). But, he was only getting treatment for depression for about six months before filing his application for benefits in December 2004. The record of that treatment, which continued until October 2005, consists of hundreds of pages of hand-written clinical observations, in no particular

3

order, often duplicated. The vast majority of notes come from a psychology extern, a student named Rebecca DeNosaquo (R. 238-39, 359), and later, beginning in July 2005, Ira Emkin. (R. 494, 617). The notes are typical of weekly therapy sessions and offer little depth of insight into the extent of Mr. Herrmann's impairment. They certainly do not paint a picture of disabling depression.

Upon initial evaluation at the Josselyn Center, Dr. Walsh made a diagnosis of moderate, major depression, and assigned a Global Assessment of Functioning ("GAF") score of 60 or 55, denoting moderate symptoms.[1] (R. 243). The therapy sessions then began. For the most part (i.e., 45 of the 62 of the therapy sessions – or 73%), the notes indicate he is in a "euthymic" or normal mood, with sporadic instances where he is reported to be agitated, frustrated, dysthymic, depressed, "dysphoric," etc.

| | |
|---|---|
| 7/21/04 | some response to treatment & therapy (R. 293) |
| 8/3/04 | dysthymic (R. 367) |
| 8/6/04 | good, energy normal (R. 289) |
| 8/17/04 | euthymic (R. 372) |
| 8/24/04 | euthymic (R. 375) |
| 9/3/04 | okay (R. 288) |
| 9/8/04 | euthymic; better sleep & energy (R. 378) |
| 9/13/04 | dysthymic (R.380) |
| 9/20/04 | sad (R. 382) |
| 9/27/04 | euthymic & more energy (R. 385) |
| 10/1//04 | lethargic (R. 286) |
| 10/4/04 | dysthymic (R. 391) |
| 10/11/04 | euthymic (R. 391) |
| 10/18/04 | irritable (R. 393) |
| 10/25/04 | euthymic (R. 396) |
| 11/3/04 | euthymic (R. 399) |
| 11/8.04 | euthymic (R. 403) |

---

[1] The GAF scale reports a "clinician's assessment of the individual's overall level of functioning." *Sims v. Barnhart*, 309 F.3d 424, 427 n. 5 (7th Cir. 2002)(citing American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed. 1994)). A GAF score of 51-60 reflects moderate symptoms or "moderate difficulty in social, occupational, or school functioning." *Id.*

| Date | Status |
|---|---|
| 11/15/04 | euthymic (R. 405) |
| 11/19/04 | better, not depressed (R. 282) |
| 11/22/04 | more depressed (R. 409) |
| 12/1/04 | dysthymic (R. 412) |
| 12/6/04 | depressed (R. 414) |
| 12/20/04 | euthymic (R. 421) |
| 1/3/05 | euthymic (R. 423) |
| 1/10/05 | euthymic (R. 425) |
| 1/17/05 | euthymic (R. 427) |
| 1/24/05 | euthymic (R. 430) |
| 1/28/05 | bad cold; low energy; mood okay (R. 432-33) |
| 1/31/05 | irritable & agitated (R. 435) |
| 2/7/05 | more dysphoric (R. 272, 437) |
| 2/14/05 | frustrated (R. 270, 439) |
| 2/23/05 | euthymic (R. 267, 442) |
| 2/25/05 | improved mood (R. 265, 444) |
| 2/28/05 | euthymic (R. 263, 446) |
| 3/7/05 | agitated (R 260, 449) |
| 3/14/05 | euthymic (R. 257, 452) |
| 3/21/05 | euthymic (R. 254, 455) |
| 3/28/05 | euthymic (R. 251, 458) |
| 4/1/05 | mood okay (R. 250, 461) |
| 4/4/05 | euthymic (R. 247, 462) |
| 4/11/05 | euthymic (R. 245, 464) |
| 4/18/05 | euthymic (R. 466) |
| 4/25/05 | euthymic (R. 469) |
| 5/2/05 | euthymic (R. 472) |
| 5/4/05 | mood okay (R. 475) |
| 5/9/05 | depressed & agitated (R. 476) |
| 5/16/05 | dysthymic (R. 479) |
| 6/1/05 | better mood (R. 482) |
| 6/6/05 | euthymic (R. 483) |
| 6/13/05 | euthymic (R. 486) |
| 6/20/05 | euthymic (R. 489) |
| 6/27/05 | euthymic (R. 491) |
| 7/5/05 | mood somewhat flat (R. 494) |
| 7/12/05 | depressed (R. 496) |
| 7/26/05 | euthymic (R. 498) |
| 8/16/05 | less depressed (R. 501) |
| 8/23/05 | less depressed (R. 502) |
| 8/30/05 | not depressed (R. 503) |
| 9/6/05 | less depressed (R. 506) |
| 9/20/05 | euthymic (R. 509) |

```
9/27/05      euthymic (R. 510)
10/5/05      mood okay (R. 512)
```

(emphasis supplied). Aside from a few isolated comments, his response to treatment is said to be excellent or good, or at worst, fair. And almost invariably, he denies having any suicidal thoughts. (R. 250, 266, 279, 281, 283, 285, 287, 388, 402, 408, 419, 433, 445, 461, 475, 500, 505, 512, 516).

The notes recount Mr. Herrmann's complaints about caring for, and dealing with, his parents – with whom he lived until they moved to an assisted living facility in the autumn of 2005 – and the disagreements he might have with his sister. The therapist then typically reports her responses: validating his complaints, encouraging his plans, or challenging him to be more realistic. Early on in their sessions, in September and October of 2004, she encouraged him to consider the possibility that he may not be eligible for disability benefits and advised him to explore other sources of income. (R. 381, 392). She explained to him that he was not even on medication and he, himself, said he felt "okay." (R. 392). Later on, in November, the notes indicate that he was on Effexor, and was feeling fine and more energetic. (R. 402, 407).

As of December 2004, Dr. Walsh reported that Mr. Herrmann had no known history of psychiatric problems. He exhibited a depressed mood, low self esteem, and reported sleep disturbance, increased anxiety, and some hopelessness. (R. 290). Mr. Herrmann indicated he was somewhat socially isolated. His speech was relevant, his thought process organized, and he reported no hallucinations or delusions. Mr. Herrmann had good contact with reality. (R. 291). Dr. Walsh reported that she had not conducted any testing. (R. 292). She described his ability to perform work-related activities as "[p]oor at this point, as he remains fairly symptomatic." (R. 293). But she offered no elaboration on how these symptoms affected his capacity for work.

6

Dr. Carl Hermsmeyer reviewed Mr. Herrmann's treatment records and prepared a Mental Functional Capacity Assessment on February 21, 2005. He stated that Mr. Herrmann suffered from moderately severe major depression, recurrent, and dysthymia. (R. 310). Dr. Hermsmeyer thought that, although Mr. Herrmann may have problems understanding, remembering, and carrying out detailed instructions, he retained the mental capacity to perform simple one- and two-step tasks at a consistent pace. (R. 310).

In April of 2005, Ms. DeNosaquo wrote to Mr. Herrmann's counsel that she had been seeing Mr. Herrmann for symptoms of depression and stress related to his parent's deteriorating mental and physical conditions. Despite her aforementioned notes, she wrote that:

> Mr. Herrrmann has consistently reported symptoms of depression, including dysphoria, irritability, poor concentration, low motivation, lethargy, insomnia, and occasional thoughts of suicide. . . . it is unlikely that Mr. Herrmann is able to perform work-related activities. He reports a great deal of difficulty paying attention and sustaining concentration for even short periods of time. Also, Mr. Herrmann reports a great deal of lethargy and fatigue. Furthermore, he has significant difficulty following through on tasks and goals. It is likely that his impaired cognitive ability to compete work tasks efficiently and/or successfully.

(R. 239). Interestingly, she had described Mr. Herrmann as being "euthymic" each time she had seen him in the five weeks prior to this report. She also related Mr. Herrmann's experiences having difficulty forming interpersonal relationships and getting along with others. (R. 239). She also recounted Mr. Herrmann's problems with side effects from medication, which seemingly had been alleviated when he began taking a "third anti-depressant medication," but she did not indicate what this was. (R. 239).

Dr. Walsh prepared a second report in May of 2005, which was much the same as her December report, although she performed some testing. Mr. Herrmann had no difficulty relating

current events, naming recent presidents, or large cities. He was able to perform serial sevens. He exhibited knowledge of proverbs, ability to perform abstract thinking and exercise good judgment. (R. 313). Still, Dr. Walsh said his "[l]imitations for work are significant due to depressive symptoms which persist and anxiety." (R. 315). Again, she offered no further explanation. As with Ms. DeNosaquo's April 2005 report, this report appears inconsistent with the prior course of Mr. Herrmann's treatment. He was described as being fine in the ten sessions preceding the report – from mid-March on – and in thirteen of the preceding fourteen sessions.

Dr. Allan Nelson examined Mr. Herrmann and prepared a report dated June 29, 2005. (R. 319-322). He described him as moderately depressed, withdrawn, and preoccupied; he thought he demonstrated some difficulty concentrating. (R. 319-320). Upon testing, there was no memory impairment and no deficits in abstract functioning. (R. 320). Mr. Herrmann exhibited a moderate fund of knowledge of current events and no gross defects in judgment. (R. 321). Dr. Nelson related that Mr. Herrmann complained of having become increasingly, severely depressed since early childhood and experiencing low self-esteem, difficulties concentrating, forgetfulness, a history of chronic insomnia, and frequent suicidal ideation (R. 321). He also told Dr. Nelson he had been drug-free for 20 years. (R. 321). The doctor thought his overall prognosis was guarded, but offered no comment on his ability to work. (R. 321).

Mr. Emkin provided Mr. Herrmann's attorney with a report on his sessions with Mr. Herrmann in December 2005. He stated that Mr. Herrmann suffered from "Personality Disorder, Mixed, Severe" and "Dysthymia." He noted that Mr. Herrmann found authority figures who frustrated him and people who acted stupidly, intolerable. Likewise for supervisors who were bossy and competitive. These issues, it was claimed, restricted his ability to work. Mr. Emkin also

reported that Mr. Herrmann had differences with his family members and found this intolerable and extremely frustrating. This was a trigger for his symptoms. (R. 617). Yet, Mr. Emkin answered "yes" when asked whether Mr. Herrmann was living in a highly supportive and protective setting that helped to attenuate his symptoms – he said Mr. Herrmann got "much support (financial & Emotional) from [living with his] parents and sister." (R. 618). The form Mr. Herrmann's counsel provided gave Mr. Emkin the option of indicating whether Mr. Herrmann suffered "marked" restrictions in certain areas or none at all – no degree in between. He checked off "marked restrictions" in activities of daily living and maintaining social functioning. (R. 619). Mr. Herrmann had no difficulties in maintaining concentration (R. 618, 619) or any episodes of decompensation. (R. 619).

Dr. Walsh filled out the same form. She, too, offered the seemingly paradoxical observation that Mr. Herrmann's family triggered his symptoms and yet he lived in a highly supportive environment. (R. 621-22). She said he was intolerant of "certain people" and had difficulty in his relationships with others. (R. 621). She checked boxes for marked limitations in activities of daily living, maintaining social functioning, and maintaining concentration. (R. 623). Again, she was given no option for anything in between "none" and "marked."

## C.
## Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

At the hearing, Mr. Herrmann testified that he lives in his parents' condo, and they cover his expenses. (R. 638). They recently went on a fixed income, and moved to an assisted living facility – they both have Alzheimer's. (R. 638, 648). That's what motivated Mr. Herrmann to apply for